## OTIS v. MARZALL.

### No. 10683.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 19, 1950.

Decided April 12, 1951.

Ralph R. Browning, Washington, D. C., with whom George Rex Frye, Washington, D. C., was on the brief, for appellant.

E. L. Reynolds, Solicitor, United States Patent Office, Washington, D. C., for appellee.

Before EDGERTON, FAHY and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This is a suit under R. S. § 4915, 35 U.S.C.A. § 63, in which a patent is sought for an invention entitled "Well Flow Regulating Apparatus." Appeal is taken from a judgment of the United States District Court for the District of Columbia, dismissing the complaint.

### I.

The appellant's device is designed to cope with some of the difficulties which are encountered when oil and gas wells are drilled to a great depth. In deep wells it appears that the pressure of the gas and oil may amount to as much as 8,000 pounds per square inch. Efforts to control this pressure at the surface outlet of the well, through ordinary chokes, commonly resulted in freezing and other difficulties. In this situation, the industry sought to reduce the pressure at the base of the well, as the high temperatures prevailing at that point are such as to prevent the reduction in pressure from causing freezing. One method adopted for this purpose was to use a so-called siphon in the form of a small tube going down inside the main pipe; this tube carried the gas and oil at reduced pressure to the earth's surface. It had the disadvantage of allowing for only one rate of flow. Another similar expedient was to place a choke at the bottom of the well, thus narrowing the orifice and reducing the pressure throughout the pipe; this invention, which was originated and patented by the present appellant (Otis, No. 1,-

654

920,103), had the advantage of being removable and replaceable with another unit of different caliber, though not without some difficulty and delay.

The next attempt to solve the problem was the invention patented by Knowlton (No. 1,905,592). This used a choke at the bottom of the well, but employed a movable flow tubing which connected the choke with the earth's surface; by raising and lowering the flow tubing through devices at the surface it was claimed that the size of the orifice in the choke could be altered, thus varying the rate of surface flow.

The appellant's latest invention, here in suit, is a refinement of his previous device. Instead of using a choke of fixed orifice size, at the bottom of the well, appellant uses a valve device, containing a spring, and acting automatically. To quote the brief of the Patent Office:

"The automatic valve comprises a fixed valve element and a sleeve, connected to and communicating with the outlet pipe and movable toward and from the valve element to regulate the flow of fluid into that pipe. The sleeve is urged toward the valve element by a spring and is exposed on its upper end to the pressure in the outlet pipe and on its lower end to the pressure of the fluid in the well. The valve mechanism acts to maintain a constant difference between the pressure immediately above and the pressure immediately below the valve, regardless of the well pressure or the extent of opening of the manual valve at the surface."

Appellant claims that a predetermined pressure reduction is thus obtained, without the drawbacks attendant upon earlier devices, and that when this is combined with a control valve at the earth's surface, a regulated rate of flow is obtainable from the well. The amount of pressure reduction is dependent upon the resistence of the spring loading mechanism of the valve. In commercial use, the valve is said to produce a reduction of some 1500 pounds; the employment of a series of regulator-valves would correspondingly increase the total reduction of pressure.

II.

Certain of appellant's claims were allowed by the Patent Office: this suit relates to seventeen claims which were not allowed.

Seven of the claims in controversy relate to the structure of the regulating valve (Claims 40, 41, 44, 46, 48, 49 and 50). The Board of Appeals in the Patent Office affirmed the rejection of these claims, chiefly by reason of a patent issued to Bruce (No. 1,199,152). The remaining ten claims relate to the combination of a control valve at the well top with a pressure reduction regulator located down in the well and automatically responsive to the adjustments of the surface choke (Claims 36, 39, 56, 57, 59, 60, 61, 62, 65 and 66). The Board of Appeals held that the Examiner had properly rejected these ten claims for lack of invention.

In the District Court, after hearing testimony, Judge Bailey dismissed the complaint. His findings of fact included the following:

"6. The Knowlton et al patent discloses the combination, in a fluid well, of a surface regulating valve and an adjustable valve at the bottom of the well for maintaining a desired differential between the fluid pressure in the well and that in the outlet pipe.

"7. The valve shown in the Bruce patent is of general application and could be readily adapted by a skilled mechanic for use in a fluid well.

"8. It would not require invention to replace the manually operated valve used by Knowlton et al at the bottom of the well by an automatic valve of the type shown by the Bruce patent.

"9. The use of two or more valves such as that shown by the Bruce patent in a fluid well would be an obvious duplication involving no invention.

"10. The claims set forth in the complaint do not define anything involving invention over the prior art.

"11. The claims set forth in the complaint are unpatentable in view of the prior art."

We have carefully reviewed the record before us. It appears that the Bruce pat-

ent (No. 1,199,152) covered an automatic flow regulating valve, the application stating that the object of the invention was to provide an automatic valve whereby the flow of liquids "may be automatically regulated by the action of the varying pressure exerted by such fluids." Bruce's valve comprises a casing containing a fixed spindle-shaped member and a movable member; the latter being of the nature of a pierced piston forced by a spring toward complete closure with and against the spindle. Pressure of the fluid on the entering side (toward the face of the piston and away from the spindle) may keep the valve partly or fully open, the extent of the opening of the orifice depending on the difference between the pressures on the two sides of the valve. The valve with its spring thus serves to provide a pressure differential between the two chambers on either side of the valve.

Appellant's valve, as we have seen, may be described (on a generalized basis) in very similar terms. Bruce illustrated his application with a drawing showing the device as one of light construction, and said: "Such valve may be used with advantage as in air-intake for the inlet of the manifold of internal combustion engines, and is shown and described herein as so placed." The application went on to say, however, that the valve "may be used with advantage to automatically regulate the flow of all fluids, by the varying pressure, whether the pressure upon the moving and actuating parts of the valve is varied by increase of pressure upon the inlet side, or diminution of pressure upon the outlet side, of such moving and actuating parts."

The Bruce patent, as illustrated in the application, is designed to deal with vaporized gasoline and air mixtures at low pressures, not varying greatly, in fact, from atmospheric pressures. In contrast, the Otis invention, here in suit, is of heavy construction, designed to deal with the exceedingly high pressures developed in deep wells. The spring in Bruce is short and fragile, responding to slight variations in pressure; the spring in Otis is long, and of high tensile strength, varying but slightly

in length as between the opened and closed positions of the valve.

Appellant argues that the valve covered by the Bruce patent was designed for purposes very different from appellant's invention and was in no way suitable for use in controlling oil and gas pressures, in a well system. It is to be noted, however, that appellant's own description of his invention is in terms as broad and general as those of the Bruce patent (though limited to fluid well use). In fact, the claims of the two inventions are closely similar. Neither one specifies exact dimensions; appellant says nothing whatever in his claims concerning the length of the spring to be used in his device, nor does he specify the angle of taper of the valve spindle (the fixed valve member), yet it is upon these two factors (together with massiveness of design) that he chiefly relies in distinguishing his invention from Bruce.

Despite the far heavier and stronger construction of appellant's regulating device, and its evident capacity to cope with the special problems of oil well pressures, we think it is essentially the same sort of valve as Bruce, and not patentable over the latter. Mr. Otis himself, when asked whether a good mechanic could take a Bruce valve and make the changes necessary to cope with the problems presented by high pressure oil wells, and to maintain a constant differential, replied:

"I will say a mechanic could design a valve that would function in principle as mentioned, but the refinements that must be put in to make it operative under the conditions of the well, that takes time.

"However, the principles, the fact that you need a quick opening valve, and the long spring, those things are within the— well within the capacity of a good mechanic, those things.

"But high pressure differentials, those are the refinements where you run into trouble."

From appellant's own testimony it seems clear that this is a case where success came as a result of well-directed skill and experiment. A valuable device, of real

utility, was created. But we have not been convinced that it constituted invention over the prior art. We therefore affirm the findings of the District Court with respect to the rejection of Claims 40, 41, 44, 46, 48, 49, and 50.

### III.

The remaining claims deal with the combination of a surface control valve with the pressure reduction regulator at the well bottom.

There is no doubt that this combination of devices has been widely accepted in the industry as providing a practical solution to the problem of controlling oil and gas pressures. It appears to have important incidental advantages, including ease of installation, low cost of operation, and the like. We have here far more than a mere "gadget" of the sort which the Supreme Court has recently warned should be regarded as unpatentable. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127. Rather, appellant has clearly made a useful contribution to industrial efficiency.

Analysis of the testimony of appellant's witnesses indicates that the chief and primary advantage claimed for the new combination over the prior art is that there is no excessive pressure build-up in the well system when the flow is partly or wholly cut off by tightening or closing the surface control. With the earlier method of using a bottom-well choke of fixed aperture, it appears that choking-down the flow at the surface control would commonly build up pressure within the well system to such a point that freezing and other difficulties would ensue. With the new device, it is claimed that closing the surface control and checking the flow causes the bottom-well regulator to close when the pressure on the outlet side of the valve (including the load factor of the valve mechanism) comes to exceed that on the inlet side, thus keeping excessive pressure from reaching the surface control.

On the other hand, the idea of coping with high pressures in oil and gas wells through a combination of surface controls and sub-surface controls is not a new one.

Knowlton taught this in the patent we have previously described (No. 1,905,592). True, Knowlton's controls were both manual, while appellant's sub-surface control is automatic. But the idea was there. And it must also be noted that such a combination is a perfectly natural and logical one; the use of a surface choke or valve is hardly to be avoided in any well system, and once a workable sub-surface valve has been found one would expect it to be combined with a surface valve. One of the purposes of the automatic sub-surface valve is to permit control of flow to be maintained at a surface valve, with the sub-surface valve adjusting automatically. The sub-surface valve is the main element, and that valve we have here held to be unpatentable.

Appellant adduced a substantial amount of testimony, including the deposition of Knowlton himself, in an effort to show that the Knowlton device with its combination of surface and sub-surface controls was inoperative. The testimony, though strong, is not by any means conclusive. It would seem that the Knowlton device was used for a period of weeks and had to be replaced, and that manual adjustments were difficult and awkward. However, the testimony is consistent with the conclusion that the device in fact was operative, though not on an efficient basis, and that it was discarded on the basis of its clumsiness as much as anything else. The Knowlton device was no doubt due for improvement. Some of that improvement has evidently come in the fashion that appellant has now elaborated. But the fact is inescapable that even though the Knowlton invention may have been inefficient or actually inoperative, it taught lessons which have now come to fruition.

We are not convinced, therefore, that the step forward represented by appellant's combination of devices reaches the standard of patentability. The main elements in the art had been perfected at an earlier date through appellant's original patent (No. 1,920,103), and through the Knowlton patent. In essence, appellant has combined the teachings disclosed in his earlier patent with those disclosed in the Knowl-

ton patent, substituting for the manually-operated valve of the Knowlton patent an automatic valve not essentially different from that disclosed by Bruce. Under the circumstances we cannot say that appellant's combination (or "aggregation") of controls is a patentable one, in view of the findings of the Patent Office and the District Court to the contrary. Standard Oil Development Co. v. Marzall, 86 U.S.App. D.C. 210, 181 F.2d 280.

The judgment of the District Court is accordingly

Affirmed.